**Lucien LOUIS, et al., Plaintiffs,**

v.

**Alan NELSON, et al., Defendants.**

**No. 81–1260–CIV.**

United States District Court, S.D. Florida, Miami Division.

Oct. 1, 1986.

---

Ira Kurzban, Miami, Fla., Robert Juceam, Washington, D.C., Christopher Hall, Terry Corrigan, New York City, Firm of Wald, Harkrader, Washington, D.C., Vera Weisz, Los Angeles, Cal., Bruce Winick, Irwin Stotzky, Mary Combs, Coral Gables, Fla., Niels Frenzen, Michael Rosen, Miami, Fla., for plaintiffs.

Michael Lindemann, Justice Dept., Washington, D.C., Leon Kellner, U.S. Atty., Patricia Kenny, Asst. U.S. Atty., Miami, Fla., for defendants.

## CORRECTED MEMORANDUM OPINION AND ORDER ON ATTORNEY'S FEES, COSTS AND EXPENSES

SPELLMAN, District Judge.

### INTRODUCTION

This matter is before the Court for a determination of the amount of attorney's fees, costs and expenses to be paid by the government to Plaintiffs' counsel[1] under the Equal Access to Justice Act[2] ("EAJA") and related statutes.[3] The Court has ruled, by separate order, that the Plaintiffs' counsel are entitled to such an award.[4] Thus, the only matter which must be resolved is the precise amount to be paid to counsel by the government.

### I

### BACKGROUND

The last two decades have witnessed an influx of refugees into the United States, particularly the South Florida area, that has been perhaps unprecedented in what is considered peacetime.

The government's handling of refugees who arrived from Haiti, the poorest nation in the Western Hemisphere, came under fire in a series of lawsuits filed in the late

---

1. This Court originally entered a Memorandum Order on Attorney's Fees, Costs and Expenses on August 29, 1986. Subsequent to the entry of the Order the Plaintiffs brought to the Court's attention, by a Motion to Amplify the Court's Order, a recent order of the Ninth Circuit Court of Appeals in *LaDuke v. Nelson,* 762 F.2d 1318 (9th Cir.1985) (Order of August 11, 1986). This Order remanded the case, in part, to the District Court to reconsider its award of a multiplier to Plaintiffs' counsel in light of three recent Supreme Court decisions—*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* — U.S. —, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986); *Library of Congress v. Shaw,* — U.S. —, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986); *City of Riverside v. Rivera,* — U.S. —, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986). Upon review of Plaintiffs' motion and memorandum this Court vacated its August 29, 1986 Order to correct any defects in that Order. The Court has now reviewed the three recent Supreme Court decisions and finds that only *Pennsylvania v. Delaware Valley Citizens' Council,* affects the Court's Order of August 29, 1986. In light of that decision and Plaintiffs motion and memorandum the Court has now corrected its decision herein.

2. 28 U.S.C. § 2412.

3. 28 U.S.C. § 1920, 28 U.S.C. § 1961.

4. *Jean v. Nelson,* No. 81–1260 (S.D.Fla. Dec. 6, 1986) (order granting entitlement to attorney's fees). Portions of said Order are reiterated herein; the Order in its entirety is attached hereto as an Appendix.

1970's and early 1980's. The bulk of these lawsuits were brought by attorneys and human rights activists who sought to protect the civil rights of the Haitian refugees. The litigation that arose from the alleged abuse of those rights was lengthy and bitter.

This case began in response to implementation by the INS of a new policy of accelerated exclusion proceedings and detention without parole of all Haitian refugees.[5] In essence, the litigation had two primary goals. First, the Plaintiffs sought to stop the mass exclusion hearings which were being held without counsel. And second, Plaintiffs sought to obtain the release from detention of class members pending the determination of their political asylum applications, thereby restoring to full force and effect the prior policy of parole pending individual exclusion proceedings.[6]

After a lengthy trial, this Court held that the new detention policy was adopted in violation of the Administrative Procedure Act ("APA") and that the Plaintiffs' continued incarceration pursuant to this policy was unlawful. *Louis v. Nelson,* 544 F.Supp. 973, 993–97 (S.D.Fla.1982). Ten days later, this Court declared the new detention policy "null and void" as to the defined class, and ordered the release of its members "forthwith" pursuant to a carefully drafted release plan. *Louis v. Nelson,* 544 F.Supp. 1004, 1006–07 (S.D.Fla. 1982). Thus, the Plaintiffs effectively obtained both of the goals they set out to achieve. As a direct result of this litigation, the Defendants stopped the accelerated mass exclusion hearings and class members were released from incarceration.[7] These results were affirmed by the Eleventh Circuit panel. *See Jean v. Nelson,* 711 F.2d 1455, 1510 n. 63 (11th Cir. 1983). The *en banc* court dismissed the Defendant's appeal of this Court's decision on the APA issue, thus leaving the results Plaintiffs obtained undisturbed. *See Jean v. Nelson,* 727 F.2d 957, 962 (11th Cir.1984), *aff'd in part,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985).[8]

---

5. The background to this litigation is discussed in *Louis v. Nelson,* 544 F.Supp. 973, 978–981 (S.D.Fla.1982) and in the Eleventh Circuit's panel opinion, *Jean v. Nelson,* 711 F.2d 1455, 1464–1474 (11th Cir.1983).

6. The Complaint, filed on June 16, 1981, asserted seven causes of action. Count I challenged the commencement of preliminary interviews for Haitian refugees without the presence of counsel or notice of the right to counsel; Count II challenged the legality of the new detention policy, which was not promulgated pursuant to the rule-making requirements of the APA; Count III challenged the failure to advise class members of their procedural rights at exclusion hearings; Count IV challenged the denial of access to counsel; Count V challenged the denial of public exclusion hearings; Count VI challenged the denial of the right to apply for political asylum; and Count VII challenged the lawfulness of the new Haitian program in its entirety under the equal protection clause. In a Memorandum Opinion and Order dated February 24, 1982, this Court dismissed Counts I, III, V and VI in their entirety and Counts IV and VII in part. It retained jurisdiction over Count II; Count IV insofar as its alleged that counsel and that the Haitian Refugee Center had a claim of access to those persons in detention; and Count VII insofar as it alleged that the detention policy was applied in a discriminatory fashion. *Louis v. Meissner,* 532 F.Supp. 881 (S.D.Fla.1982).

7. The relief obtained by the Plaintiffs mooted many of the issues raised in the Complaint. Plaintiffs were released from detention and indirectly obtained counsel or notice of the right to counsel, thereby ensuring that class members would have notice of their procedural rights at exclusion hearings (Count III), including the right to apply for political asylum (Count VI). As a result of this lawsuit, defendants stopped their practice of preventing lawyers from contacting Haitians at closed exclusion hearings (Count I). With the release of class members, Plaintiffs have had access to class members (Count IV). Also as a direct result of this litigation, the INS promulgated new parole regulations which are facially neutral and which require parole decisions to be made without regard to race or nationality. *See* 8 C.F.R. § 212.5 (1985).

8. The Eleventh Circuit panel that originally heard this matter found that the defendants discriminated against the Plaintiff class in the enforcement of the new detention policy and that the Plaintiffs were therefore denied equal protection. *Jean v. Nelson,* 711 F.2d at 1509. The Eleventh Circuit, sitting *en banc,* however, held that excludable aliens have no constitutional rights with respect to their applications for admission, asylum, or parole. *Jean v. Nelson,* 727 F.2d 957 (11th Cir.1984) (*en banc*). The Supreme Court held that the *en banc* court

The results of this litigation were clearly overwhelming and important. To be sure, the Plaintiffs waited anxiously for the vindication of their rights; the attorneys, who brought this suit *pro bono publico,* have waited to be compensated for their efforts. Moreover, the government used all of its considerable resources in opposing Plaintiffs' contentions at every turn. From pretrial discovery, through trial and successive appeals, the government moved for stays of Court Orders, forced repeated applications for emergency relief, put Plaintiffs in a posture requiring a brief on all pleaded issues, on every motion, and opposed, in fact as well as law, each and every important issue asserted by Plaintiffs.

The Court has reviewed in detail hundreds of pages of affidavits in which counsel outlined their hours, costs and expenses, and their customary fees. Counsel calculated their fees under several theories, taking into account any reduction which the Court indicated it would make to reflect its finding that the position of the government concerning the equal protection issue was reasonable. In addition to having the affidavits before it for review, the Court has had the benefit of five days of hearings including expert testimony, and has carefully assessed the credibility of the witnesses presented.

Thus, the Court has significant documentation and testimony on which to base its findings. Furthermore, having presided over this litigation from soon after its inception, the Court is uniquely able to evaluate the skill, diligence, contribution and effectiveness of counsel.

## II

### FIGURES INVOLVED

The following charts reflect the preliminary amounts of costs, expenses and fees requested by counsel. These figures do not take into consideration any reduction or enhancement for any purposes, but serve simply to acquaint the reader with the sums involved in a case of this magnitude.

### Costs and Expenses

| Attorney | § 1920 Costs | EAJA Expenses | Total |
|---|---|---|---|
| HRC, Inc. | $47,204.82 | $39,081.25 | $86,286.07 |
| Fried, Frank | 39,951.34 | 56,374.26 | 95,325.60 |
| Bruce Winick | –0– | 1,372.90 | 1,372.90 |
| Wald, Harkrader | –0– | 499.82 | 499.82 |

### Attorneys Fees

| Attorney | Total Hours | Hourly Rate | Total |
|---|---|---|---|
| I. Kurzban | 2,172.5 | $125.00 | $271,562.50 |
| I. Stotzky | 1,194.85 | 125.00 | 149,356.75 |
| B. Winick | 1,476.75 | 125.00 | 184,593.75 |
| V. Weisz | 628.2 | 75.00 | 47,115.00 |
| C. K. Hall | 97.8 | 100.00 | 9,780.00 |
| Wald, Harkrader | 62.75 | 75.00–85.00 | 4,973.00 |
| M. Rosen | 620.00 | 125.00 | 77,500.00 |
| Fried, Frank | 3,821.00 (atty.) | 50.00–175.00 | 419,071.00 |
| Fried, Frank | 1,188.00 (para.) | 40.00 | 47,524.00 |

### III

### THE STANDARD

The Equal Access to Justice Act provides for the award of reasonable expenses and attorney's fees in the litigation. 28 U.S.C. § 2412(d)(2)(A). Pursuant to the EAJA "attorney's fees shall not be awarded in excess of $75.00 per hour unless the court

should not have reached the constitutional issue because under the statutes and regulations now in effect, parole decisions must be made without regard to race or national origin. *Jean v. Nelson,* 105 S.Ct. at 2998.

determines that an increase in the cost of living or special factors, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." *Id.* [9]

Under the governing Eleventh Circuit precedent, the factors identified in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974) should be applied by the Court in determining a reasonable fee within the scope of the Equal Access to Justice Act. *Florida Suncoast Villas, Inc. v. United States,* 776 F.2d 974, 975 (11th Cir.1985). Of course, the *Johnson* factors are not exhaustive. *Pennsylvania v. Delaware Valley Citizens' Council,* — U.S. —, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986); *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

The Court must thus apply these various factors in ascertaining the reasonableness of the attorney fee request. In ascertaining the appropriate hourly rate, the EAJA limits the amount to $75.00 per hour unless the Court makes additional findings to justify an increased hourly rate based upon an increase in the cost of living or "special factors." In addition to these statutory criteria justifying a greater than $75.00 per hour rate, the Court may further enhance the total attorney's fee. The Court may enhance the fee upon a finding by the Court of the existence of factors *other than* those appropriate in ascertaining a reasonable fee as well as an appropriate hourly rate under the Equal Access to Justice Act. *Pennsylvania v. Delaware Val-*

ley *Citizens' Council, supra; Blum, supra; Hensley, supra.*

In the instant case, the Court has already found that the Plaintiffs were the prevailing party for purposes of awarding them attorneys' fees and other expenses under the EAJA. The Court further found that the government's position on the Administrative Procedure Act ("APA") issue was not substantially justified, but that any award would be adjusted downward to reflect the fact that the government's position was not unreasonable as to the equal protection claim. The Court observed, however, that "there was considerable overlap between the APA and the equal protection claim." (Appendix, p. 12).

Additionally, the Court noted that "[b]ecause the litigation before the Supreme Court concerned only the equal protection claim the Plaintiffs are not entitled to compensation under the EAJA for their efforts in that Court." (Appendix, p. 14 n. 8). The possibility of partially compensating the Plaintiffs for those efforts was not entirely ruled out, since the government's change in position concerning their argument on whether nationality could be a factor in determining whether an alien could be paroled may have unnecessarily prolonged the litigation.

Thus, the Court must first ascertain what a reasonable number of hours are for each counsel; what an appropriate hourly rate under the EAJA should be for each counsel; and whether an enhancement or diminution of the fee thus calculated is appropriate.

## IV
## THE JOHNSON FACTORS

The Court will begin its analysis by examining the facts of this case under the

---

**9.** § 2412(d)(2)(A) states:

"fees and other expenses" includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees (The amount of fees awarded under this subsection shall be based upon prevailing market rates for the kind and quality of the services

furnished, except that (i) no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States; and (ii) attorney fees shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.);

twelve factors listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974).[10] Such an analysis will provide the basis for determining the reasonable number of hours expended by each counsel and whether the hourly rate should be $75.00 or less. *Florida Suncoast*, 775 F.2d at 976.

### A. The time and labor required.

■ This lawsuit was commenced more than five years ago. The class action suit involved numerous plaintiffs. The record in this case includes seventeen volumes of pleadings, a forty-five volume trial transcript, and a docket, containing over six hundred entries. These reflect the enormous amount of time and labor devoted to this case.

The time spent by counsel on this lawsuit is listed earlier in this Order. The Court points out that the attorneys have already reduced their hours to reflect the hours spent on the equal protection claim and the time spent at the Supreme Court level. Thus, the hours spent by counsel for which they seek compensation are considerably lower than those listed previously in this Order.[11] The revised schedule of hours, as prepared by counsel, reads as follows:

| Attorney | Total Hours | | (E.P. Hours) | (60% S.Ct.) | Reimbursable Hours |
|---|---|---|---|---|---|
| I. Kurzban | 2,172.5 | | ( 66.4) | ( 268.17) | 1,837.93 |
| I. Stotzky | 1,194.85 | | ( 15.0) | ( 276.00) | 903.85 |
| B. Winick | 1,476.75 | | ( 23.0) | ( 153.48) | 1,300.27 |
| V. Weisz | 628.2 | | ( 0 ) | ( 0 ) | 628.2 |
| C. Hall | 97.8 | | ( 0 ) | ( 0 ) | 97.8 |
| M. Rosen | 620.0 | | ( 0 ) | ( 46.2 ) | 573.8 |
| Wald, Harkrader | 62.75 | | ( 0 ) | ( 0 ) | 62.75 |
| Fried, Frank | 3,821.0 | (Atty) | (363.0) | ( 674.4 ) | 2,783.6 |
| | 1,188.1 | (Para) | ( 0 ) | ( 186.06) | 1,002.04 |
| TOTAL | 11,261.95 | | (467.4) | 1,604.31 | 9,190.24 |

Several factors added to the volume of hours spent in litigating this case. First, local counsel had to confer with out-of-state counsel on virtually every step taken. The local attorneys, Ira Kurzban, Irwin Stotzky, Bruce Winick, Vera Weisz, Michael Rosen, and for a certain period of time Christopher Keith Hall, had to maintain constant contact with co-counsel in New York, Robert Juceam and his law firm Fried, Frank, Harris, Shriver & Jacobson, and at the initial phases, the Washington law firm of Wald, Harkrader & Ross. Naturally, having counsel located in more than one place adds to the number of hours required to prosecute a case, but there is certainly no prohibition against having local and out-of-state counsel work on one lawsuit; it is quite common.

Second, the Plaintiffs faced a formidable foe. The government had, at one time or another, thirty different attorneys working on the case. Naturally, the Plaintiffs had

---

**10.** The twelve factors are:

(1) the time and labor required;
(2) the novelty and difficulty of the questions;
(3) the skill requisite to perform the legal service properly;
(4) the preclusion of other employment by the attorney due to acceptance of the case;
(5) the customary fee;
(6) whether the fee is fixed or contingent;
(7) time limitations imposed by the client or the circumstances;

(8) the amount involved and the results obtained;
(9) the experience reputation and ability of the attorneys';
(10) the "undesirability" of the case;
(11) the nature and length of the professional relationship with the client; and
(12) awards in similar cases.

**11.** This table reflects the figures proposed by Plaintiffs' counsel. As will become apparent, the figures will be revised by the Court.

to respond in kind with their own forces, although the Court notes that Plaintiffs had approximately one half the number of counsel.

Third, as the Court mentioned in its December 6, 1985 Order, the government's change in position regarding the plaintiffs' claim that the government did in fact have a detention policy that was instituted *ultra vires* of the APA, served simply to prolong the litigation unnecessarily.

Fourth, although the Court noted at one point that the APA claim might be appropriate for summary judgment, it did not so find. Indeed, when Plaintiffs requested summary judgment before trial, the government opposed them.

Finally, the government also forced Plaintiffs to litigate constitutional claims that would not have needed to be litigated if the government had conceded at the trial level that the INS was precluded by statute and regulations from making nationality-based decisions—a position they did not adopt until argument before the Supreme Court.

In short, having first hand knowledge of the demands of this case, the intensity and length of the pleadings, briefing and argument and the time schedules involved, the Court is in the perhaps unenviable position of knowing that the time spent by Plaintiffs' counsel in the prosecution of this case has been reasonable and well supported by the record.

The government took issue with the record keeping of Plaintiffs' counsel. The Court finds this contentiousness to be without merit. For five years the attorneys kept accurate time sheets, setting forth the time spent and the nature of work involved. Counsel were extensively cross-examined by the government, and all responded to the satisfaction of the Court that by and large, time sheets reflected contemporaneous record keeping. The Court has in its possession exhibits which include the time sheets for counsel and finds any inadequacies in record keeping to be inconsequential.

## B. The novelty and difficulty of the questions.

There can be little serious dispute but that this has been a novel and complex case. Mere volume does not necessarily indicate complexity, but in the instant case, the size of the record and the passage of time do signify what has been the product of extreme complexity and difficulty. The appellate court does not differ with this view. *Jean v. Nelson*, 711 F.2d 1455, 1462 (11th Cir.1983).

## C. The skill requisite to perform the legal services properly and the experience, reputation and ability of the attorneys.

The Court finds that these factors must be considered together, rather than separately as they are listed in *Johnson*. These factors are intertwined, and must be discussed in context. Each attorney or firm will be addressed individually so that their particular role in this case will be given fair credit.

### *Ira J. Kurzban*

Ira J. Kurzban's abilities and dedication as an immigration lawyer and champion of the public interest are nationally renowned. He has been identified by the *National Law Journal* as one of this country's twenty leading immigration law experts and has been described as "an extremely capable lawyer of widely recognized legal skill and dedication to the poor and disadvantaged," *Haitian Refugee Center, Inc. v. Smith*, 644 F.Supp. 382, 389 (S.D.Fla.1984).

As counsel for the National Council of Churches of Christ in the United States and the National Emergency Civil Liberties Foundation, he has litigated and been counsel of record in every class action lawsuit brought on behalf of Haitian refugees in the Southern District of Florida.

He has received local and national recognition and numerous awards for this work. For example, Mr. Kurzban was the first recipient of the Tobias Simon Pro Bono Service Award. This award is given by the

Florida Supreme Court; Mr. Kurzban received the award on April 18, 1982. Also in 1982, Mr. Kurzban was recognized by *American Lawyer Magazine* as being one of the most prominent *pro bono* attorneys in the nation. *Esquire* magazine included Mr. Kurzban in a story on new stars to watch. In a special edition of *Newsweek* magazine entitled "Sweet Land of Liberty," Mr. Kurzban was hailed as one of the "New American Heroes." Perhaps one of the achievements of which Mr. Kurzban should be most proud, centers around his creation of and involvement with a student and alumni run *pro bono* program at the University of California at Berkeley Law School.

In addition to his litigation experience with respect to immigration law and international law, he is a nationally recognized expert in many of the areas of law involved in this case, including political asylum, refugee status, and immigration litigation, and has lectured and published extensively in these areas in respected journals and before sophisticated audiences.

He has taught immigration law, immigration litigation, civil rights, and civil liberties litigation, and has appeared before Congressional Committees on matters concerning immigration legislation.

In sum, when the words "immigration attorney" are uttered, there is little doubt but that the name Ira Kurzban springs to mind.

### Fried, Frank

Fried, Frank is a fine law firm with a strong commitment to public interest litigation and has a very high reputation. Despite local counsel's pleas, Fried, Frank, Harris, Shriver & Jacobson was virtually the only firm in the country possessing the requisite resources and experience in both immigration and federal litigation that was willing to participate in this lawsuit without immediate compensation.

Fried, Frank's reputation was attested to by the government itself at the hearing on the issue of attorneys fees: "We would state that with regard to Mr. Juceam's

firm, that we have the highest regard for that firm in the Department of Justice...."

Fried, Frank regularly participates extensively in *pro bono publico* practice, for causes liberal and conservative, in support of and in opposition to governmental positions and policy, including immigration and refugee matters.

At any given time, Fried, Frank had numerous attorneys working on the instant case. This is not unusual at a large firm. Rather than list the attorneys and their achievements, since only their names were put into evidence, the Court will only take notice that the law firm as a whole enjoys a sterling reputation.

Robert E. Juceam, the partner at Fried, Frank who organized and supervised its participation in this case, is an attorney of outstanding ability and reputation, as is reflected in the testimony of his colleagues. The Court points out that Mr. Juceam is not seeking any compensation for himself at all despite the fact that he spent untold hundreds of hours working on this case. Mr. Juceam's selflessness and generosity merit special mention by the Court and set an example for all of us.

Mr. Juceam is held in awesome esteem among immigration practitioners even though immigration law is not his exclusive field of practice.

Mr. Juceam's practice has included, on a regular basis, substantial general federal court and agency litigation, in addition to the representation of aliens in the United States and abroad, and of companies seeking to engage aliens for employment in the United States.

A past president of the American Immigration Lawyers Association, Mr. Juceam has also served as the organization's vice president, secretary, liaison committee member to the United States Department of State and of the Immigration and Naturalization Service and on its Board of Governors. He has lectured extensively on immigration law and refugee policy, and has testified before Congressional commit-

tees and subcommittees concerning proposed immigration legislation.

### Bruce J. Winick

Bruce J. Winick is a tenured full professor at the University of Miami School of Law. He has taught Administrative Law, Federal Civil Procedure, and Federal Jurisdiction. He is an outstanding scholar and a dedicated teacher.

Professor Winick has been employed as an associate at a large law firm in New York City, by the City of New York in a number of administrative and legal capacities, and has served the American Civil Liberties Union of Florida as its General Counsel.

Professor Winick has extensive litigation experience in state and federal courts, including federal lawsuits involving judicial review of administrative action and also has extensive experience as a consultant to law firms and public litigant groups on the constitutional aspects of administrative law and special procedural issues involved in litigation against the government.

As a result of this experience, Professor Winick is a national expert in the areas of judicial review of agency action, the procedural complexities of litigation against the government, the constitutional subjects of due process and equal protection, and immigration law.

Professor Winick is also an expert in the use of statistics in judicial proceedings and his work in this area was crucial to development of Plaintiffs' discrimination claim.

### Irwin P. Stotzky

Irwin P. Stotzky is a tenured full professor at the University of Miami Law School and his reputation is a very high one in this community. Professor Stotzky was instrumental in assisting the great late Soia Mentschikoff, former Dean of the University of Miami School of Law, in elevating the status of the law school to one of the nation's leading institutions.

Professor Stotzky has taught, among other courses, constitutional law, criminal law and constitutional criminal procedure, legal skills and jurisprudence, and immigration law. He has published, lectured and consulted extensively in these areas, and in particular in the area of constitutional aspects of immigration litigation.

Professor Stotzky has been involved in litigation in federal and state courts that raised constitutional questions that played an important part in this lawsuit. He consulted or worked directly on several other Haitian cases, playing an important role in litigation of the constitutional claims in these cases.

As a result of this experience, he is recognized as a national expert on the First Amendment, the constitutional subjects of due process and equal protection, international law and immigration law. His expertise was invaluable to the presentation of Plaintiffs' constitutional claims.

### Michael J. Rosen

Michael J. Rosen is an outstanding young attorney who enjoys an excellent reputation in the Southern District of Florida.

Mr. Rosen's practice consists almost exclusively of federal criminal litigation. Prior to joining Rosen & Rosen, a Miami firm, he gained hundreds of hours of trial experience as an attorney with the Federal Public Defender's office in the Southern District of Florida.

Mr. Rosen is a member of the Federal Bar Association and was chairperson of the committee for redrafting the Standing Discovery Order entered in all federal criminal cases in the Southern District of Florida.

As the only attorney ready to assist full-time in preparation and conduct of the lengthy trial of Plaintiffs' claims, Mr. Rosen's expertise in federal trial practice was invaluable.

### Vera Weisz

Vera Weisz has extensive experience in representation of Haitian refugees. During the course of her employment at Florida Rural Legal Services, Inc. in Belle Glade, Florida, and then at the Haitian

Refugee Center, Inc., in Miami, Florida, she has been involved in the representation of over one thousand Haitian refugees seeking asylum in the United States, has represented over five hundred clients at exclusion proceedings, deportation, and asylum hearings, and has participated in three major federal lawsuits related to the rights of Haitian refugees. Ms. Weisz has lectured, conducted training seminars, and published on asylum law.

Ms. Weisz was one of the few attorneys in Miami who could speak fluently French and Creole, the languages used by most of the class members. Her experience in processing claims of Haitian refugees and her language abilities were crucial to her work in communicating with and preparing the testimony of Haitian plaintiffs and witnesses.

### Christopher K. Hall

Christopher K. Hall has extensive experience in the areas of international and immigration law. He has contributed his time to the Lawyers Committee for International Human Rights in connection with refugees and asylum applications and has taught international law, international human rights and international organizations at the University of Miami Law School.

He also has extensive litigation experience. He frequently argues in the Second Circuit and the New York State Court of Appeals and intermediate appellate courts and has worked on three Supreme Court cases.

Mr. Hall also worked as an associate at Kurzban, Kurzban & Weinger, P.A. and at the New York Attorney General's office.

### Wald, Harkrader

Two attorneys from the Washington, D.C. law firm of Wald, Harkrader participated in the initial stages of the lawsuit and seek compensation for their services. These two attorneys, Mary Coombs and Mark Stern, also enjoy fine reputations in the legal community.

### D. The quality of the work.

■ In determining the appropriate fee, the Court must also consider the quality of counsels' performance. *Pennsylvania v. Delaware Valley Citizens' Council, supra.* In the instant case, the Court finds that not only is there record evidence that counsel performed at an unusually high level of skill for attorneys charging the rates they did, but the Court also points out that additional credit must be given for having taken the case in the first place and *maintaining* the levels of dedication and quality for five years.

It is true that the quality of the work can be reflected in the number of the hours documented. But, to apply this principle in a vacuum or to hold that the quality of the work is reflected solely by the number of billable hours would, in effect, hold the law and its practitioners to standards and rules that are more fitting for economists. It would be unfair to equate the degree of skill held by counsel with the swiftness with which she or he could perform the work. To do so only encourages shoddiness and haste, neither having a place in the legal world. The Court finds that based on its first hand knowledge of the quality of Plaintiffs' counsels' work, and as evidenced by the record, that it represented unsurpassable quality.[12]

### E. The preclusion of other employment by the attorney due to the acceptance of the case.

■ Ira Kurzban testified that this case caused him to turn down more lucrative work which would have benefited his law firm's coffers. The demands of this case also caused a serious crimp in the scholarly work generally undertaken by members of academia, such as Professors Stotzky and Winick.

### F. Awards in similar cases.

The Eleventh Circuit recently affirmed the lower court's award of attorneys' fees

---

**12.** For another Court's view concurring in the quality of the work performed by counsel, see *Haitian Refugee Center, Inc. v. Smith,* 644 F.Supp. 382 (S.D.Fla.1984) (Order granting motion for fees, costs and expenses).

in a related case of up to $125.00 per hour. *Haitian Refugee Center, Inc. v. Meese,* 791 F.2d 1489 (11th Cir.1986). The Court notes that other decisions under the EAJA have awarded substantial fees, including awards based upon an hourly rate well in excess of $75.00 per hour, *see e.g., International Woodworkers of America, AFL/CIO Local 3–98 v. Donovan,* 769 F.2d 1388 (9th Cir.1985); *LaDuke v. Nelson,* 762 F.2d 1318, 1332–33 (9th Cir.1985).

### G. The customary fee.

■ There is nothing in the record to contradict the figures given by counsel at the hearing and throughout the documentation that state their customary fees. Those attorneys in academia adequately testified as to what their fees are when working on outside projects.

### H. Whether the fee is fixed or contingent.

■ The fees in this case were contingent. Had the Plaintiffs failed to attain the level of success they had, the attorneys involved would have had to sustain a loss of several million dollars—not an easy thing for even the most lucrative practitioners.

### I. Time limitations imposed by the client or the circumstances.

■ The time pressures of this case were constant. They were imposed, in large part, by the Court, and by the appellate courts, but were also due in part to the exigencies of the situation. The demands of this Court were overwhelming. In sum, the pace was rather hectic throughout the case.

### J. The "undesirability" of the case.

■ There was uncontroverted evidence at the hearing that lead counsel received several letters which contained the senders' distaste with Mr. Kurzban's decision to participate in this case. Mr. Kurzban also lost some clients solely on account of his humanitarian stand in this case. The Court knows from first hand experience that this was not a popular case in some of the public's eye. The facts involved in this case brought out sincere and intense reactions from the community; some people were sympathetic with the Plaintiffs' plight, others were not shy about their lack of sympathy. Counsel, the Court and the Plaintiffs were exposed to the darker side of humanity on more than one occasion.

### K. The nature and length of the professional relationship with the client.

This factor is not relevant to the analysis in this case.

### L. The Amount involved and the results obtained.

■ This factor is crucial in this case, and provides the basis for a fully compensatory award. For, as the Supreme Court states in *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983): "[t]he result is what matters."

Plaintiffs clearly accomplished the primary goals of the lawsuit, which were to stop the mass exclusion hearings being held without counsel, to enforce the rule of law through the Administrative Procedure Act, to establish that race and national origin were impermissible factors in the enforcement of facially neutral statutes, and to obtain the class members' release from detention.

Finally, Plaintiffs' counsel took the government to task here, and succeeded at prohibiting the government from pursuing a course of action contrary to our laws and the forces of human dignity. This litigation reinforced the concept that parole decisions must be made without regard to race or national origin. *Jean v. Nelson,* 472 U.S. 846, 105 S.Ct. 2992, 2998, 86 L.Ed.2d 664 (1985).

### V

### ADDITIONAL FACTORS

#### A. Duplication

■ One of the most significant areas of concern expressed by the government

involved its contention that counsel's efforts were duplicative and thus not compensable. The Court must disagree. It is not uncommon, nor should it be, that attorneys work in groups. In situations such as these, the court should:

> assess the possibility that reported hours include duplication by reviewing with particular care the number of lawyers present at hearings, depositions and other discovery proceedings, and by evaluating the roles played by the lawyers in the litigation generally. The Court can look to how many lawyers the other side utilized in similar situations as an indication of the effort required. Because utilizing more than one lawyer may be reasonable in some situations, such as during settlement conferences or during trial, *we decline to require an automatic reduction of reported hours to adjust for multiple representation or potential duplication. Ramos v. Lamm,* 713 F.2d 546, 554 (10th Cir.1983) (emphasis added).

Counsel has represented to the Court, and the Court can find no reason to cast aspersions on the representation that counsel went through their time sheets countless times and purged them of any unnecessary duplication. Furthermore, it must be noted that lack of duplication is not the goal of efficient attorneys, avoidance of *unreasonable* duplication is the goal. Thus, an award will be reduced "only if the attorneys are *unreasonable* doing the *same* work." *Johnson v. University College of University of Alabama,* 706 F.2d 1205, 1208 (11th Cir.1983) (emphasis in the original).

In the instant case, multiple attorneys for the plaintiffs *and* the government participated at every stage of the litigation. This was not a one or two lawyer case. Each attorney had his or her own specialty or strength. After receiving a pleading, counsel had to review the document, confer with out-of-state counsel, plan their strategy, divide the work depending upon the nature of the task, conduct research, gather resources, and then meet as a group. Naturally, there was room for duplication. That fact, however, does not call for the conclusion that any duplication was unreasonable or tha, it taints the entire efforts.

The Court finds that the work of cou. el was not unreasonably duplicative, and that "[a]ll attorneys who contribute their services to a case may be awarded reasonable attorneys' fees." *Dowdell v. City of Apopka,* 698 F.2d 1181, 1188 (11th Cir.1983) (citation omitted).

**B. Unsuccessful claims: Equal Protection and Supreme Court Arguments**

As the Court stated in its December 6, 1985 Order, it found it necessary to reduce Plaintiffs' counsel's hours to reflect the fact that the government was substantially justified in the stance it took in response to the equal protection claim. Additionally, since mainly the equal protection claim was argued at the Supreme Court level, this Court suggested that it might be inappropriate to grant an award to counsel for its efforts at that level. However, throughout the proceedings at the district and appellate court levels, the government argued that nationality could be a factor in determining whether an alien is paroled. But in the Supreme Court, the government changed its position. It argued that the INS' rules and regulations prohibited the INS from making parole decisions based on nationality, but that under the Constitution, the INS was not prohibited from making such decisions. This Court finds that if the government had argued at the District Court and Eleventh Circuit levels the position it took in the Supreme Court, the constitutional claims would not have needed to be litigated. The government's change in position, therefore, indicates that to some degree it lacked substantial justification. *Haitian Refugee Center, Inc. v. Meese,* 791 F.2d 1489, 1497 (11th Cir.1986) (Looking to the consistency of the government's position in determining substantial justification). Thus, some award is in order for counsel's efforts in the Supreme Court.

As for the equal protection claim, counsel has delineated those hours which

can be solely attributable to that issue and has excised them from their total hours. Counsel has also excised 60% of the time spent at the Supreme Court level. The Court finds both excisions are low, and thus rules that such time must be further reduced.

The Supreme Court observed in *Hensley:* "[t]here is no precise rule or formula for making this determination. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Hensley,* 461 U.S. at 436–37, 103 S.Ct. at 1941. The Court finds that both options suggested by the Supreme Court are applicable to the case at bar.

Specific hours spent on the equal protection issue have been identified and eliminated from the total. As previously mentioned, the Court finds that counsel's estimate of time spent on the equal protection claims is too low. By the Court's estimate, forty percent (40%) of counsel's time was spent on clearly non-equal protection matters. Perhaps sixty percent (60%) of counsel's time was spent on interrelated matters; an insignificant portion of that time was spent exclusively on equal protection issues. Of the 60% of the time spent on commingled material, the Court estimates that approximately 25% of that time was spent on equal protection issues. Thus, a reduction of 15% from the total number of hours is in order.

Those hours spent at the Supreme Court level shall be reduced by 75% rather than 60%. The Court will allow compensation for a fractional number of hours, because in light of the government's change in position and in light of the other issues briefed in the Supreme Court some award of fees is appropriate. The legal position of the government may have been substantially justified in some sense; the tactical position of the government, however, cannot claim the same status, and the Plaintiffs' counsel should not be penalized for the government's change in position concerning whether it could discriminate under existing statutes and regulations. *See, Hai-*

*tian Refugee Center, Inc. v. Meese, supra* at 1497.

In sum, the Court finds that its reduction of the hours spent on the equal protection claims is more appropriate than counsel's estimates. Additionally, the Court has, *sua sponte,* reduced counsel's total hours to reflect a 75% reduction in those hours spent at the Supreme Court level.

**C. Documentation**

■ The last factor to consider is whether counsel adequately documented their time and hours so as to merit a fully compensatory award.

The government argues that attorneys are required to keep contemporaneous, almost perfect, records and time sheets or else suffer the consequences. Such a draconian approach is unnecessary and not supported by the case law. Rather, counsel must conscientiously keep records and time sheets which "should identify the general subject matter of his [her] time expenditures." *Hensley,* 461 U.S. at 424, 103 S.Ct. at 1935. There is no prohibition against reconstructing time sheets where contemporaneous records are not kept. *Ramos v. Lamm,* 713 F.2d 546, 553 n. 2 (10th Cir.1983).

Even where there are discrepancies in time records, no reduction in the award is mandatory. Where an attorney's affidavit is not specific as to the nature of the work performed, but does provide the court with the general area of the subject matter, the court need not demand greater accuracy. *See Preston v. Heckler,* 596 F.Supp. 1158, 1161 (D.Alaska 1984).

In reviewing the affidavits, and having heard testimony on the matter, the Court finds it unnecessary to reduce, based on the government's allegation that counsel kept inadequate records, the total award or the number of hours for which counsel seeks compensation.

**VI**

**HOURLY RATE**

Under the EAJA, the district court may adjust the hourly rate upward from $75.00

if special factors are present. The Act states in pertinent part: "attorneys fees shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceeding involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A).[13]

The Court finds that there are special factors warranting an upward adjustment of the fee.

### A. Increase in the cost of living

■ Unlike many cases, the work done has been spread fairly evenly over the past five years, perhaps with the exception of 1986. Because of the inherently sporadic nature of the judicial system, work had to be done in spurts (to prepare for oral argument, briefing schedules, etc.). "By specifying inflation as a 'special factor', Congress indicated its concern that lawyers receiving fees at different times obtain equivalent value." *Action on Smoking and Health,* 724 F.2d 211, 219. Thus, there is clear instruction from the language of the Act that counsel should have its award reflect an increase in the cost of living which results from a long delay in payment. *Copeland v. Marshall,* 641 F.2d

880, 893 (D.C.Cir.1980) (*en banc*) (citation omitted).

### B. Limited availability of counsel

■ There was substantial testimony that the Plaintiffs' counsel encountered a shameful amount of disinterest from the local legal community when counsel sought to gather forces for this lawsuit.[14]

As mentioned earlier, this was a complex case. Counsel had to have knowledge of many interwoven and discrete areas of the law. Additionally, any attorney who did become involved in this case had to do so at her or his own expense, since the possibility of being reimbursed for the work was remote. Finally, the Court heard undisputed testimony that despite counsel's best efforts, they were unable to attract local counsel that had the combination of knowledge, financial capability, and dedication to take on the responsibilities that this case entailed.

Based on the foregoing factors, this Court finds that an hourly fee award above $75.00 per hour is appropriate for Plaintiffs' counsel. The Court finds that the following schedule reflects the number of hours reasonable expended and the appropriate hourly rate for each attorney or law firm:

---

**13.** Recent amendments to the EAJA make the Act permanent and contain clarifying provisions that in virtually every respect broaden and strengthen the Act's application. Besides expanding eligibility and making express the Act's application to a wide range of proceedings, the amendments specifically adopt a broad meaning of "position of the United States" to include agency action as well as the government's litigating position and in other respects reaffirms that the statutory language is to be interpreted broadly in favor of private parties. H.R.Rep. No. 99–120, 99th Cong., 1st Sess. at 8–9, 19 (1985), U.S.Code Cong. & Admin.News 1985, pp. 132, 136–138, 147.

Throughout the legislative history, the purposes of the Act—"to expand the liability of the United for attorneys' fees and other expenses" and "to increase accessibility to justice" are emphasized. The Committee decries the fact that

awards during the initial three-year period of the Act were "dramatically less" than predicted. *Id.* at 4, 8–9, U.S.Code Cong. & Admin.News 1985, pp. 132, 136–138. These amendments and their legislative history make it clear that the Act is to be applied more forcefully to encourage private parties to pursue litigation against the government.

**14.** As the Eleventh Circuit observed, "[e]fforts had been made by the INS to secure representation for the Haitians, especially *pro bono,* in the Miami area. The response it received is an ugly reflection on the commitment with which the bar meets its responsibility to make legal services available to the disadvantaged." *Haitian Refugee Center, Inc. v. Smith,* 676 F.2d 1023, 1031 n. 16 (5th Cir.1982).

| Attorney | Hours | E.P./S.CT. | Total | Rate | Lodestar |
|---|---|---|---|---|---|
| Kurzban | 2,172.5 | 335.21 (S.Ct.) 325.88 (E.P.) | 1511.41 | $125.00 | $188,926.25 |
| Stotzky | 1,194.85 | 345.0 (S.Ct.) 179.23 (E.P.) | 670.62 | $125.00 | $ 83,827.50 |
| Winick | 1,476.75 | 191.85 (S.Ct.) 221.51 (S.Ct.) | 1063.39 | $125.00 | $132,923.75 |
| Weisz | 628.2 | –0– | 628.2 | $ 75.00 | $ 47,115.00 |
| Hall | 97.80 | –0– | 97.80 | $100.00 | $ 9,780.00 |
| Rosen | 620.00 | 57.75 (S.Ct.) | 562.25 | $100.00 [15] | $ 56,225.00 |
| Wald, Harkrader | 62.75 | –0– | 62.75 | $75–85.00 | $ 4,973.00 |
| Fried (atty) | 3,821.00 | 843.0 (S.Ct.) 573.1 (E.P.) | 204.9 | $50–175.0 | $270,551.25 |
| (para) | 1,188.10 | 232.58 (S.Ct.) | 955.52 | $ 40.00 | $ 38,220.80 |

## VII

## ENHANCEMENT OF THE FEE AWARD

The Supreme Court has repeatedly recognized that in certain circumstances an enhancement of the fee award is appropriate. *Pennsylvania v. Delaware Valley Citizens' Council*, —— U.S. ——, 106 S.Ct. 3088, 3898, 92 L.Ed.2d 439 (1986); *Blum v. Stenson*, 465 U.S. 886, 899, 104 S.Ct. 1541, 1549, 79 L.Ed.2d 891 (1984); *Hensley v. Eckerhard*, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). The Court is aware that such a conclusion is proper only in certain rare and exceptional cases and must be supported by specific evidence on the record in detailed findings. *Pennsylvania v. Delaware Valley Citizens' Council, supra,* 106 S.Ct. at 3098.

The Court believes that this case presents the rare and exceptional circumstances warranting an enhancement of the fee award. This conclusion is based on the Court's finding that the following factors, none of which were previously considered by the Court in its assessment of the fee award under the Equal Access to Justice Act, exist.

### A. Pro Bono Publico

██ A special factor meriting enhancement of the fee award that does not arise in most Equal Access to Justice Act cases is the Pro Bono Publico nature of this case and of the Plaintiffs' attorneys' motivation in bringing it. This was not a case merely to vindicate the pecuniary interests of the Plaintiffs; rather, it was to free them from unlawful detention and to vindicate their rights to fair process and equal treatment. Plaintiffs' counsel acted in an exemplary fashion and are to be commended for their outstanding efforts in the public interest. Moreover, their exemplary conduct has had a salutory effect on the Bar.

The *pro bono publico* bar in this community and throughout the nation has been shaken to its roots; a more conscientious attitude toward the plight of the indigent and unpopular has been taken in recent years due to this case, and the nation-wide efforts to obtain *pro bono* counsel in the context of the case. Indeed, as a direct result of this litigation and counsels' effort, the largest *pro bono* program in the history of the United States was established. Helton, *The Most Ambitious Pro Bono Ever Attempted,* 12 Hum.Rts. 19 (1984). Surely this "result" is one which cannot be measured in monetary terms, but must be measured nonetheless.

### B. The Vindication of Public Rights

██ Plaintiffs' counsel functioned in this litigation as private attorney generals

15. Although Mr. Rosen requested $125.00 an hour, this Court is of the opinion that, when Mr. Rosen's role in this case is compared to that of lead counsel, an hourly rate of $100.00 is appropriate.

seeking to vindicate public rights. Indeed, they frequently characterized their aims in the lawsuit as vindicating the rule of law in the context of immigration practice. As previously indicated, this was not a case, like perhaps most are under the Equal Access to Justice Act, to vindicate the purely precuniary interests or other private rights of their clients. Rather, it sought to put an end to illegal immigration practices and to establish a consistent policy for all aliens facing detention by the Immigration Service. As a direct result of counsels' actions, the public interest has been vindicated through the government's publication of its new detention policies. Actions of this kind seeking to vindicate such important public interests are especially to be commended, justifying enhancement of the fee award.

### C. The Emotional Hardship to Plaintiffs' Counsel

■ The members of Plaintiffs' class spent many months in unlawful detention, suffering great hardship and deprivation. Many sustained psychological problems. Several committed suicide, including one of the named class representatives. The human stakes were high. Moreover, this was a nationwide class action involving members of Plaintiffs class dispersed to detention facilities throughout the country. These factors placed special pressures on counsel that were exceptional. The Court is not unaware of the tremendous emotional and psychological pressure that this situation placed upon Plaintiffs' counsel in virtually all of their activities in this lawsuit. This special circumstance also merits enhancement of the fee award.

### D. The Government's Litigious Position

■ The government took an unusually unwaivering and litigious position throughout the litigation. Many of the government's contentions and litigating postures were unwarranted and unnecessarily prolonged the litigation. The government used all of its considerable resources in opposing Plaintiffs' contentions at every turn. From pre-trial discovery, through trial and successive appeals, the government moved for stays of Court Orders, forced repeated applications for emergency relief, put Plaintiffs in a posture requiring a brief on all pleaded issues, on every motion, and opposed, in fact as well as law, each and every important issue asserted by Plaintiffs. The government even opposed Plaintiffs' efforts to seek summary judgment on the A.P.A. issue and thereby unnecessarily prolonged the litigation. The Court notes that even the EAJA recognizes the independent importance of placing sanctions against overly litigious conduct. 28 U.S.C. § 2412(d)(1)(C). Although the government's conduct was surely motivated by good faith, their overly litigious posture unnecessarily prolonged this litigation.

As a result of the four factors the Court concludes that an enhancement of the attorneys' fee award in the amount of an additional 15% is warranted. *Each* of these factors taken *alone* would, in the Court's view, warrant such a 15% enhancement.

Even if a question is raised as to the permissibility of an enhancement under the E.A.J.A., the above factors should be viewed, alternatively, as additional "special factors" justifying an increase in the hourly rates requested and already awarded above, 28 U.S.C. § 2412(d)(2)(A).

### VIII

### CONCLUSION ON ATTORNEYS' FEES

In conclusion, the Court finds that a fifteen percent (15%) enhancement of the award is proper after consideration of all special factors.

In light of the analysis above concerning the award and the 15% enhancement thereof, the Court finds that the following chart represents the correct numbers and tabulations which constitute a fair and just attorneys' fees award in this case:

| Attorney | Award | 15% Enhancement | Total Fee Award |
|---|---|---|---|
| Kurzban | $188,926.25 | $28,338.94 | $217,265.19 |
| Stotzky | 83,827.50 | 12,574.13 | 96,401.63 |
| Winick | 132,923.75 | 19,938.56 | 152,862.31 |
| Weisz | 47,115.00 | 7,067.25 | · 54,182.25 |
| Hall | 9,780.00 | 1,467.00 | 11,247.00 |
| Rosen | 56,225.00 | 8,433.75 | 64,658.75 |
| Wald | 4,973.00 | –0–[16] | 4,973.00 |
| Fried, (atty) | 270,551.25 | 40,582.69 | 311,133.94 |
| Frank (para) | 38,220.80 | not applicable | 38,220.80 |
| | | | $950,944.87 |

## IX

## COSTS

The Plaintiffs' counsel requests reimbursement for costs and expenses in the following amounts:

| Attorney | § 1920 | EAJA | Sup.Ct. | Total less Sup.Ct. |
|---|---|---|---|---|
| HRC, Inc. | $47,204.82 | $39,081.25 | $ 9,059.31 | $ 77,226.76 |
| Fried | $39,951.34 | $56,374.26 | $13,964.34 | $ 82,361.26 |
| Winick | –0– | $ 1,372.90 | $ 1,206.01 | $ 166.89 |
| Wald | –0– | $ 499.82 | –0– | $ 499.82 |
| | | | | $160,254.73 |

There is clearly a lack of consistency among the courts when it comes to determining which items are recoverable as costs or expenses under 28 U.S.C. § 1920 or under 28 U.S.C. § 2412(d)(2)(A) respectively.

Section 1920 of Title 28 states:

A judge or clerk of any court of the United States may tax as costs the following:

(1) Fees of the clerk and marshal;

(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

The above list is not exhaustive, however, of which items courts recognize as recoverable in cases brought under the EAJA.

That is so because the EAJA states in pertinent part in Section 2412(d)(2)(A):

For the purpose of this subsection—

16. Because the attorneys from Wald, Harkrader were involved only in the preliminary stages of this litigation, the enhancement factors are not applicable to their efforts.

(A) "fees and other expenses" includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees.

Thus, the language of the EAJA illustrates that while the "costs" incurred by the party may be recoverable only under § 1920, "expenses" may be recoverable under § 2412(d)(2)(A). The clear language of the latter section lists certain expenses as examples, not limitations. *Hoopa Valley Tribe*, 569 F.Supp. at 947.

Courts have interpreted the above statutory sections inconsistently. For example, in *Action on Smoking and Health v. C.A.B.*, 724 F.2d 211, 224 (D.C.Cir.1984), the court did not allow compensation as expenses under the EAJA for taxi fares, filing, wrapping postage, but did allow compensation for photocopying costs, citing to *NAACP v. Donovan*, 554 F.Supp. 715, 719 (D.D.C.1982).

Another court allowed prevailing plaintiffs to recover their copying costs, but arbitrarily reduced the requested amount of 25¢ per page to 10¢. *Wolfe v. Wolfe*, 570 F.Supp. 826, 826 (D.S.C.1983).

In the case of *American Academy of Pediatrics v. Heckler*, 580 F.Supp. 436, 440 (D.D.C.1984), the court went a step further. There, the court disallowed compensation under the EAJA for research costs an overhead, as well as transportation and filing. Furthermore, the court held that paralegal and law clerk time was only compensable at the actual cost of their salaries paid out by the law firm. This court strongly disagrees with that position.

In a decision handed down the same day as *American Academy of Pediatrics*, the same court held that "to award 'fees' for law clerk and paralegal time at hourly charges billed to clients would, in effect, be to compensate those firms for both overhead and profit." *Ashton v. Pierce*, 580 F.Supp. 440, 443 (D.D.C.1984). Yet, the court did permit reimbursement for the salaries paid to the paralegals and law clerks. Insight into that court's somewhat jaundiced view of the EAJA is provided by the following passage:

> It is now accepted that lawyers who prevail in these cases may be entitled to be paid a reasonable fee for services which are still somewhat euphemistically referred to as *"pro bono"*. Attorneys hope to receive and usually request out-of-pocket expenses and a handsome profit. Often the government is asked to pay for the "learning experiences" of coveys of junior associates and other assistants assigned to a case to break the tedium of everyday practice.

580 F.Supp. at 444.

 This Court finds the above harangue to be simply inapplicable to the instant case. If the court in *Ashton* had been privy to the workings of this case, it would have been crystal clear that any abuses inherent in our legal system are seldom found in the fee applications of dedicated lawyers who provided a vital service to our citizenry by offering, *without compensation*, to protect the rights of all persons. Congress perceived a need to offer the possibility of compensation to attorneys who are willing to take the government to task; but *only* when the government acts without substantial justification are the public coffers opened.

With regard to the compensability of paralegal and law clerk time, the Court finds that the analysis set forth in *Hoopa Valley v. Watt*, 569 F.Supp. 943, 947 (N.D. Cal.1983) to be more pursuasive. There, the court noted:

> [T]he lower rates sought for law clerk services are reasonable and should be compensated as part of attorney's fees because the use of such services is a cost-efficient component of the modern practice of law.

Although law clerk and paralegal services constitute a part of attorney's fees, there is no basis for applying any multiplier to the figures. Thus, the Court will compensate Plaintiffs' counsel for the work performed by their paralegals and law

clerks pursuant to the rate schedule provided by counsel.

The Court agrees with the Plaintiffs' position that virtually all expenses and costs reasonably incurred are recoverable under either 28 U.S.C. § 1920 or the EAJA. This position is consistent with the ameriolative purposes of the EAJA and the appropriately broad view of costs taken by the Eleventh Circuit in the civil rights context. *Dowdell v. City of Apopka, Florida,* 698 F.2d 1181, 1192 (11th Cir.1983). ["with the exception of routine office overhead normally absorbed by the practicing attorney, all reasonable expenses incurred in case preparation, during the course of litigation, or as an aspect of settlement of the case may be taxed as costs under section 1988."] The court allowed reimbursement in *Dowdell* for travel, telephone and postage, and cited with approval several cases which permitted recovery for additional costs and expenses, such as mileage, photocopying, food and lodging.

This Circuit is not alone in its position that costs and expenses are not limited to docket fees and the like. Rather, the Ninth Circuit recently permitted an award for costs of telephone calls, postage, air courier and attorney travel expenses on the ground that similar costs are routinely awarded under other fee statutes, and thus should be awarded under the EAJA. *International Woodworkers of America, AFL–CIO, Local 3098 v. Donovan,* 769 F.2d 1388 (9th Cir.1985). *See also Hoopa Valley Tribe v. Watt,* 569 F.Supp. 943 (N.D.Cal.1983) (telephone and travel costs awardable as part of expenses since they would normally be billed to client).

■ As for the witness and expert witness fees, the Court is satisfied that the testimony provided by Messrs. Gitlow, Bernsen and Gordon at trial was necessary, as was the testimony of Messrs. Mailman and Rogow at the hearing on attorney's fees.

■ With regard to the claims for computer time, the Court finds that Lexis charges are dissimilar from typing in that Lexis fees are paid to entities outside the law firm and are also generally charged to the client. Computer charges should be allowable as expenses and this Court will so allow compensation for those expenses.

■ Finally, the Court opines that the record keeping practices of the claimants has been sufficiently accurate so that no deduction therefore is necessary. The Court also notes at this time that the HRC, Inc., being an organization that has neither the facilities nor financial strength to employ a state of the art billing system, did a good job of record keeping in light of those limitations.

## X

## SOME DEDUCTIONS ARE NECESSARY

■ The Court can find no way to justify awarding compensation for secretarial overtime as either costs or expenses. Secretarial work is part of the everyday activity of a law firm which constitutes its overhead. Secretarial salaries are paid to employees of the firm, and thus are not similar to those monies paid to persons outside the firm such as process servers or witnesses. Furthermore, their salaries cannot be equated with costs, such as filing fees, or expenses such as postage or computer charges, which are similarly paid to entities outside of the law firm. Attorneys cannot be compensated for normal overhead expenses.

The Court finds no authority to support the inclusion of hours and subsequent charges related to secretarial overtime in the award. The chart outlining the costs and expenses awardable is thus amended to reflect the deduction as follows:

| Attorney | § 1920 | EAJA | Overtime | S.Ct. | Total |
|----------|--------|------|----------|-------|-------|
| HRC | $47,204.82 | $39,081.25 | $ 633.40 | $ 9,059.31 | $ 76,563.36 |
| Fried | $39,951.34 | $56,374.26 | $14,752.60 | $13,964.34 | $ 74,939.26 [17] |
| Winick | –0– | $ 1,372.90 | –0– | $ 1,206.01 | $ 166.89 |
| Wald | –0– | $ 499.82 | –0– | –0– | $ 499.82 |
| | | | | | $152,169.33 |

## XI

## CONCLUSION ON COSTS AND EXPENSES

 In conclusion, the Court finds that the summary of costs and expenses framed above accurately reflects what the law of this Circuit requires. In order to give true vitality to the EAJA and its corrolating statutes, courts must not be parsimonious solely because the monies paid are removed from the public coffers. On the contrary, the law requires courts not to consider that prevailing plaintiffs are paid from public funds. *Copeland v. Marshall*, 641 F.2d 880, 894–96 (D.C.Cir.1980).

## XII

## FEES FOR FEES

 Under a recent case, the Eleventh Circuit held:

| Attorneys | Fees | Costs | Expenses |
|-----------|------|-------|----------|
| Ira J. Kurzban | $13,125.00 | $ 2,407.31 | $301.36 |
| Bruce J. Winick | $ 1,687.50 | | |
| Irwin P. Stotzky | $ 2,562.50 | | |
| Vera Weisz | $ 2,500.00 | $ 358.62 | |
| Fried, Frank (atty) | $33,993.75 | | |
| (para) | $24,110.00 | $20,526.91 (Cost and expenses) | |

None of the fees, costs or expenses have been challenged by the government by way of motion, counter-affidavit or request for evidentiary hearing. As the government has voiced no objection to these fees, costs and expenses and based upon the Court's previous findings under *Johnson* and the other factors enumerated above, which it incorporates herein, the Court believes these requests are reasonable.

[I]n this case of first impression for the Eleventh Circuit, we apply the general intent of the Act and decline to hold that this court may award fees for fees only if the government's position in the fees litigation was not substantially justified. *Haitian Refugee Center, Inc. v. Meese*, 791 F.2d 1489, 1500 (11th Cir. 1986).

Following the decision in *Haitian Refugee Center, Inc. v. Meese, supra*, Plaintiffs' counsel submitted affidavits to support their request for attorneys' fees, costs and expenses for litigating the fee issue to date. The amounts that Plaintiffs' counsel have requested are as follows:

## XIII

## POST JUDGMENT INTEREST

 As for post-judgment interest, the EAJA was amended August 5, 1985 to include the following paragraph:

(f) If the United States appeals an award of costs or fees and other expenses made against the United States under this section and the award is affirmed in whole or in part, interest shall

---

**17.** This figure adds in the expert witness fee and costs and copying which add up to $7,330.60, said amount not being included in the Plaintiffs'

Proposed Findings of Fact and Conclusions of Law, and which the Court includes at this time.

be paid on the amount of the award as affirmed. Such interest shall be determined under Section 1961(a) of this title, and shall run from the date of the award through the day before the date of the mandate or affirmance.

This statutory amendment overrules this circuit's previous ruling in *Arvin v. United States*, 742 F.2d 1301 (11th Cir.1984) which held that the district court was without authority to award interest on EAJA attorney's fees awards. The amendment is self-explanatory and requires no further comment by the Court.

## XIV

### CONCLUSION

It is within the Court's discretion to ascertain what constitutes a reasonable award of attorney's fees, costs and expenses under the Equal Access to Justice Act. The Court must make sure that the Act's fees provisions are not used to create "windfalls" to counsel. But, at the same time, counsel must be fairly compensated for their efforts. The findings and conclusions above illustrate what this Court believes is a fair award

Based on the above and foregoing, it is hereby

ORDERED AND ADJUDGED that attorneys fees, costs and expenses are awarded to counsel as follows:

IRA KURZBAN is awarded $217,265.19 in attorney's fees;

IRWIN STOTZKY is awarded $96,401.63 in attorney's fees;

BRUCE WINICK is awarded $152,862.31 in attorney's fees and $166.89 in costs;

VERA WEISZ is awarded $54,182.25 in attorney's fees;

CHRISTOPHER KEITH HALL is awarded $11,247.00 in attorney's fees;

MICHAEL ROSEN is awarded $65,-658.75 in attorney's fees;

WALD HARKRADER is awarded $4,973.00 in attorneys' fees and $499.82 in costs and expenses;

FRIED, FRANK is awarded $311,133.94 in attorneys' fees, $38,220.80 in paralegal and law clerk fees and $75,939.26 in costs and expenses; and

HAITIAN REFUGEE CENTER, INC. is awarded $76,563.36 in costs and expenses.

It is further ORDERED AND ADJUDGED, that attorneys' fees, costs and expenses for the fee litigation are awarded to counsel as follows:

IRA KURZBAN is awarded $13,145.00 in attorney's fees, $2,407.31 in costs and $301.36 in expenses;

BRUCE J. WINICK is awarded $1,687.50 in attorney's fees;

IRWIN P. STOTZKY is awarded $2,562.50 in attorney's fees;

VERA WEISZ is awarded $2,500.00 in attorney's fees and $358.62 in costs and expenses;

FRIED, FRANK, HARRIS and SHRIVER is awarded $58,103.75 in attorney's fees and paralegal fees and $20,536.91 in costs and expenses.

## APPENDIX

**ORDER CONCERNING PLAINTIFFS' ENTITLEMENT TO ATTORNEYS' FEES, COSTS AND EXPENSES PURSUANT TO THE EQUAL ACCESS TO JUSTICE ACT**

THIS CAUSE came before the Court on the plaintiffs' Motion for Attorneys' Fees, Costs, and Expenses under the Equal Access to Justice Act. For the reasons detailed below, this Court finds that the plaintiffs are entitled to an award of attorneys' fees, costs, and expenses allocable to their efforts in litigating their claims before this Court and the United States Court of Appeals for the Eleventh Circuit. By separate Order, this Court shall schedule a hearing to determine the amount that shall be awarded.

The Equal Access to Justice Act ("EAJA") provides that:

a court shall award to a prevailing party ... fees and other expenses ... incurred by that party in any civil action ... brought by or against the United States ... unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A).

Thus, in order to grant an award of attorneys' fees, this Court must find that the plaintiffs were the prevailing parties within the meaning of the Act, that the government's position was not substantially justified and that there are no other special circumstances that would make an award unjust. All of the requirements for an award of attorneys' fees have been met here.

### THE PLAINTIFFS WERE THE 'PREVAILING PARTIES'

The Supreme Court has observed that "plaintiffs may be considered 'prevailing parties' for attorneys' fees purposes if they succeed on any significant issue in the litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, [461] U.S. [424], 103 S.Ct. 1933, 1939 [76 L.Ed.2d 40] (1983), (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–279 (1st Cir.1978)). There can be no doubt

in this case that the plaintiffs succeeded on a significant issue.

This case began in response to implementation by the INS of a new policy of accelerated exclusion proceedings and detention without parole of all Haitian refugees.[1] In essence, the litigation had two primary goals. First, the plaintiffs sought to stop the mass exclusion hearings which were being held without counsel.[2] And second, plaintiffs sought to obtain the release from detention of class members pending the determination of their political asylum applications, thereby restoring to full force and effect the prior policy of parole pending individual exclusion proceedings.[3]

After a lengthy trial, this Court held that the new detention policy was adopted in violation of the Administrative Procedure Act ("APA") and that plaintiffs' continued incarceration pursuant to this policy was unlawful. *Louis v. Nelson*, 544 F.Supp. 973, 993–97 (S.D.Fla.1982). Ten days later, this Court declared the new detention policy "null and void", and ordered the release of class members "forthwith" pursuant to a carefully drafted release plan. *Louis v. Nelson*, 544 F.Supp. 1004, 1006–07 (S.D. Fla.1982). Thus, the plaintiffs effectively obtained both of the goals they set out to achieve. As a direct result of this litigation, the defendants stopped the accelerated mass exclusion hearings and class members were released from indefinite in-

1. The background to this litigation is discussed in this Court's opinion, *Louis v. Nelson*, 544 F.Supp. 973, 978–981 (S.D.Fla.1982), and in the Eleventh Circuit's panel opinion, *Jean v. Nelson*, 711 F.2d 1455, 1464–1474 (11th Cir.1983).

2. Indeed, shortly after this case was filed the government conceded that the exclusion orders entered at such hearings were invalid and therefore said orders were vacated. Thus, plaintiffs were the prevailing party on this aspect of the litigation and, in light of the government's action, its position was not substantially justified.

3. The complaint, filed on June 16, 1981, asserted seven causes of action. Count I challenged the commencement of preliminary interviews for Haitian refugees without the presence of counsel or notice of the right to counsel; Count II challenged the legality of the new detention policy, which was not promulgated pursuant to the rule-making requirements of the APA;

Count III challenged the failure to advise class members of their procedural rights at exclusion hearings; Count IV challenged the denial of access to counsel; Count V challenged the denial of public exclusion hearings; Count VI challenged the denial of the right to apply for political asylum; and Count VII challenged the lawfulness of the new Haitian program in its entirety under the equal protection clause. In a Memorandum Opinion and Order dated February 24, 1982, this Court dismissed Counts I, III, V, and VI in their entirety and Counts IV and VII in part. It retained jurisdiction over Count II, Count IV insofar as it alleged that Haitians in detention had first amendment rights of access to counsel and that the Haitian Refugee Center had a claim of access to those persons in detention; and Count VII insofar as it alleged that the detention policy was applied in a discriminatory fashion. *Louis v. Meissner*, 532 F.Supp. 881 (S.D.Fla.1982).

carceration.[4] These results were affirmed by the Eleventh Circuit panel. *See Jean v. Nelson,* 711 F.2d 1455, 1510 n. 63 (11th Cir.1983). The *en banc* court dismissed the defendant's appeal of this Court's decision on the APA issue, thus leaving the results plaintiffs obtained undisturbed. *See Jean v. Nelson,* 727 F.2d 957, 962 (11th Cir.1984), *aff'd in part,* [472 U.S. 846] 105 S.Ct. 2992 [86 L.Ed.2d 664] (1985).[5]

The fact that plaintiffs did not "prevail" on their claim that the new policy violated their fifth amendment rights to equal protection does not mean that they cannot be considered "prevailing parties" for attorneys' fees purposes. Plaintiffs need not prevail on every issue to be considered a prevailing party. For purposes of attorneys' fees, "[t]he result is what matters." *Hensley,* 103 S.Ct. at 1940. Plaintiffs merely pursued alternative litigation theories in attacking the INS' new detention policy.[6]

## THE GOVERNMENT'S POSITION ON THE APA ISSUE WAS NOT SUBSTANTIALLY JUSTIFIED

The government has the burden of proving that its position "had a reasonable basis both in law and fact." ' H.R.Rep. No. 1418, 96th Cong., 2d Sess. 10, U.S.Code Cong. & Admin.News 1980, pp. 4953, 4989;

S.Rep. No. 253, 96th Cong., 1st Sess. 6 (1979). The Eleventh Circuit has emphasized that the legislative history of the Equal Access to Justice Act requires "the government to make a *strong showing* to demonstrate that its action was reasonable." *S. & H. Riggers & Erectors, Inc. v. O.S.H.R.C.,* 672 F.2d 426, 430 (11th Cir. 1982) (citations omitted) (emphasis supplied by the court). *See also Environmental Defense Fund, Inc. v. Watt,* 722 F.2d 1081, 1085 (2d Cir.1983). The government has not and, indeed, cannot make the requisite showing here.

On August 5, 1985, the Equal Access to Justice Act was amended with regard to the "position of the United States" when determining substantial justification. Under the amendment, which applies to pending cases, the government must not only show substantial justification with regard to its litigating position, but also "the action or failure to act by the agency upon which the civil action is based." Pub.L. No. 99–80, § 2(c)(2)(d). Under the facts of this case, the distinction makes little difference. *See Ashburn v. United States,* 740 F.2d 846 n. 1 (11th Cir.1984) (noting that in a typical case there is no real difference between action of agency and litigation position). The INS made a determination that its new detention policy did not have to comply with the rulemaking require-

4. The relief obtained by the plaintiffs mooted many of the issues raised in the complaint. Plaintiffs were released from detention and indirectly obtained counsel or notice of the right to counsel, thereby ensuring that class members would have notice of their procedural rights at exclusion hearings (Count III), including the right to apply for political asylum (Count VI). As a result of this lawsuit, defendants stopped their practice of preventing lawyers from contacting Haitians at closed exclusion hearings (Count I). With the release of class members, plaintiffs have had access to counsel and counsel have had access to class members (Count IV). Also as a direct result of this litigation, the INS promulgated new parole regulations which are facially neutral and which require parole decisions to be made without regard to race or nationality. *See* 8 CFR § 212.5 (1985).

5. The Eleventh Circuit panel that originally heard this matter found that the defendants discriminated against the plaintiff class in the

enforcement of the new detention policy and that plaintiffs were therefore denied equal protection. *Jean v. Nelson,* 711 F.2d at 1509. The Eleventh Circuit, sitting *en banc,* however, held that excludable aliens have no constitutional rights with respect to their applications for admission, asylum, or parole. *Jean v. Nelson,* 727 F.2d 957 (11th Cir.1984) (en banc). The Supreme Court held that the *en banc* court should not have reached the constitutional issue because under the statutes and regulations now in effect, parole decisions must be made without regard to race or national origin. *Jean v. Nelson,* 105 S.Ct. at 2998.

6. This Court was well aware that after it found that the new policy was violative of the APA that "[t]echnically ... [it] need not go further in order to resolve plaintiffs' other claims for relief." *Louis,* F.Supp. at 997. However, the Court chose to review the equal protection claim in the interests of "judicial economy and fairness." *Id.* at 997–98.

ments of the Administrative Procedure Act. When this was challenged in Court, attorneys from the United States Attorney's Office and the Department of Justice argued that the INS was correct. The position taken by the INS and the position taken by the government attorneys in defending the INS' actions were essentially the same. And these positions were unreasonable.

The INS was well aware prior to this litigation that the courts in this jurisdiction had consistently rejected INS' claim that the APA did not apply to changes of substantive policy regarding Haitian refugees. *National Council of Churches v. Egan*, No. 79–2959–Civ–HOEVELER, Slip. op. at 3 (S.D.Fla. Aug. 3, 1979) (preliminary injunction entered, not appealed); *Sannon v. United States* 460 F.Supp. 458, 466–67 (S.D.Fla.1978), *remanded to be vacated as moot*, 631 F.2d 1247 (5th Cir.1980).

Indeed as early as March 20, 1981, the INS Acting General Counsel wrote a memorandum summarizing the legal requirements applicable to the defendants' detention policy and mass exclusion hearings. Citing the *Sannon* case as authority, he advised the INS that "[a]ny change in regulations which takes rights or privileges away from aliens will most likely require a 60–day notice and comment period, and a 30–day delayed effective date ..." Legal Memorandum by INS Acting General Counsel Paul Schmidt, Px94. But even though the INS was apparently aware that it needed to comply with the APA, the defendants intentionally refused to do so. As this Court found:

> They admitted to the Court that they made a conscious decision not to promulgate a rule pursuant to the Administrative Procedure Act. The evidence shows that they never seriously undertook the difficult task of drafting a set of guidelines concerning which aliens would be placed in detention. Instead, INS issued general instructions to its field officers to start detaining excludable aliens who

do not establish a prima facie claim for admission.

*Louis v. Nelson*, 544 F.Supp. at 981.

In light of prior precedent and the advice of counsel, INS' refusal to comply with the APA was not reasonable; nor was the position of the United States Attorney's Office in defending these actions by claiming that the change in policy was not a rule subject to the rulemaking requirements of the APA. This Court rejected the government's claims in its opinion, finding that the change in policy was "clearly" a rule subject to the rulemaking requirements of the APA. *Louis v. Nelson*, 544 F.Supp. at 997. The Eleventh Circuit found that defendants were not likely to succeed on this issue and denied their request for a stay. *Jean v. Nelson*, 683 F.2d 1311, 1312 (11th Cir.1982). After hearing the case, the Eleventh Circuit panel completely rejected the government's arguments that the new policy was not a rule to which the APA rulemaking requirements applied and affirmed the decision of this Court. *Jean v. Nelson*, 711 F.2d at 1483.

The government's factual position in this litigation was also without merit. The defendants repeatedly denied that there was a new detention policy for Haitians, claiming that the district directors still had complete discretionary authority to parole individuals or, alternatively, that the directors were merely enforcing the statute. *See also Jean v. Nelson*, 711 F.2d at 1469–1470 (discussing conflicting testimony at trial by Administration officials as to whether there was a policy change). It was only well into the litigation that the defendants admitted what had been obvious—that there was a detention policy and that they had instituted this policy without complying with rulemaking procedures. Since the plaintiffs had consistently maintained that there was a detention policy, the defendants' unreasonable factual position unnecessarily prolonged the litigation of this matter.

Finally, the defendants have not demonstrated any special circumstances which would make an award unjust. Indeed, con-

sidering the extraordinary efforts of plaintiffs' counsel and the excellent results they achieved, it would be unjust to deny an award of attorneys' fees.

## THE PROPER STANDARD

The issue of attorneys' fees in this case is complicated, however, by the fact that the government's legal position—that the INS' actions did not violate the equal protection guarantee of the fifth amendment—must be considered reasonable in light of the fact that the Eleventh Circuit, sitting *en banc,* actually agreed with the government on this point. Even though the Supreme Court found that the circuit court should not have reached the constitutional issue, the government was certainly "justified" for EAJA purposes in defending against the claim that the INS' actions violated the equal protection guarantee.

In *Hensley,* the Supreme Court emphasized that counsel should not be penalized for pursuing, in good faith, alternative claims for relief.[7] Although the Court observed in a footnote that the standard it set forth is "generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party,'" 103 S.Ct. at 1939 n. 7, this Court is of the opinion that these principles must be modified to some degree for fee awards under the Equal Access to Justice Act. Unlike the Civil Rights Attorney's Fees Awards Act, which allows prevailing parties in suits brought under specified civil rights statutes to recover "a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988, the Equal Access to Justice Act mandates the award

of attorneys' fees *unless* "the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). Thus, under the Equal Access to Justice Act, a prevailing party in a suit against the government cannot be awarded fees when the government's position was reasonable.

In *Matthews v. United States,* 713 F.2d 677 (11th Cir.1983), the Eleventh Circuit articulated the standard to be used in an Equal Access to Justice Act claim when a plaintiff prevails in some but not all its claims against the United States. Adopting the approach of the Third Circuit in *Goldhaber v. Foley,* 698 F.2d 193, 197 (3d Cir.1983), the Court noted that neither the terms of the Act nor its legislative history addressed this situation. It therefore began its analysis by looking to the underlying purpose of the Equal Access to Justice Act. It found:

> The governing principle of the Act is that the "United States should pay those expenses which are incurred when the government presses unreasonable positions during litigation." The central purpose of the Act is "to eliminate any barrier to litigation challenging unreasonable government conduct presented by the specter of attorney's fees.... Because the Equal Access to Justice Act contemplates deterring only unreasonable positions," it would contravene the purposes of the Act to require the government to bear the expense of defending even its reasonable positions. Following the

---

**7.** According to the Court:

> In [certain] cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.
>
> Where a plaintiff has obtained excellent results, his attorney should recover a fully com-

> pensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not sufficient reason for reducing a fee. The result is what matters.

> *Hensley v. Eckerhart,* 103 S.Ct. at 1940 (citation and footnote omitted).

Third Circuit, we adopt the position "that the United States is only responsible for that portion of the expenses attributable to its unjustified positions."

713 F.2d at 683–684 (citations omitted).

Thus, when reviewing a claim for attorneys' fees under the EAJA, the Court must take into account not only the results obtained but also the reasonableness of the government's positions on each of the disputed claims. As discussed above, the Court finds that the government was not substantially justified in its position on the APA claim. By prevailing on this claim, the plaintiffs obtained virtually all the relief they requested, a factor that should weigh heavily in the determination of the fee award. On the other hand, because the government did not act unreasonably in defending against the claim that the INS' actions violated the equal protection guarantee of the fifth amendment, any fee award must also be reduced accordingly.

The Supreme Court observed in *Hensley* that when a lawsuit involves a "common core of facts" or "related legal theories" as this case did, "[m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide hours expended on a claim by claim basis." 103 S.Ct. at 1940. This observation is particularly apt here. Determining the amount of time spent on each claim would be particularly onerous in this case, given the interrelated nature of the facts and theories and the number of attorneys involved in the various aspects of the litigation. The Court notes that there was considerable overlap between the APA and the equal protection claim. The preliminary issues were essentially the same. For example, for both claims plaintiffs had to establish that they had standing, that this Court had subject matter jurisdiction, that they were entitled to proceed as a class, that a "final"

INS order was not required, that they had exhausted administrative remedies, that the detention policy was not committed to agency discretion and that the political question doctrine did not apply.

Even at trial, the presentation of the equal protection issue overlapped to some degree with the APA claim. Defendants argued that there had not been a change in detention policy and that INS officials continued to have the same discretion to grant parole. Plaintiffs' Exhibit 1, for example, was offered to prove both that the defendants had a policy and that this policy discriminated against Haitians.

This Court does not think it is appropriate to further protract the matter by attempting to identify which specific hours and expenses should be eliminated from a fee award because they are attributable to the equal protection claim and not the APA claim. Rather, one of the factors the Court will consider in determining the ultimate fee award in this case is that the government was not unreasonable in defending against the equal protection claim. Any award will be adjusted downward accordingly. The Court is of the opinion that the percentage of total attorney time that should be attributed to each claim can be approximated.

The Court will conduct a hearing to determine the total number of hours that can be considered "reasonably expended" on the litigation and a reasonable hourly rate for the attorneys involved. In addition to the downward adjustment discussed above, the Court will consider whether the fees should be enhanced for any reason pursuant to 28 U.S.C. 2412(d)(2), including the excellent results achieved by plaintiffs' counsel, the limited availability of qualified counsel for this kind of litigation, and the delay in payment of this award.[8]

---

8. Because the litigation before the Supreme Court concerned only the equal protection claim, the plaintiffs are not entitled to compensation under the EAJA for their efforts in that Court. However, the plaintiffs have pointed out that the government apparently changed its litigation position as the case progressed. Before

the Supreme Court, the government argued that the INS was precluded by statute and regulations from making nationality-based distinctions. Based upon this representation, the Court found that it was unnecessary to reach the constitutional issues. At trial, however, the government argued to the contrary—that na-

DONE AND ORDERED in Chambers, at Miami, Florida, this 6th day of December, 1985.

tionality can be a factor in determining whether an alien is paroled.

This Court recognizes that if the government had taken the position it now takes during the trial, the constitutional claims may not have needed to be litigated. The Court will therefore consider the government's apparent change in position in adjusting the final fee award.